Filed 6/29/16  P. v. MacFarlane CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALAN BRUCE MACFARLANE,<br><br>    Defendant and Appellant. | A141326<br><br>(Sonoma County<br>Super. Ct. No. SCR-623290) |

**INTRODUCTION**

Alan Bruce MacFarlane ("defendant"), a Vietnam veteran with limited mobility in one arm, purchased a rifle at a California gun shop legally and then modified it to accommodate his disability.  Unbeknownst to him, he asserted, his modifications rendered the firearm an illegal assault weapon under California law.  A few days after he altered the weapon, MacFarlane voluntarily allowed a deputy sheriff into his home to investigate an unrelated matter, who then discovered the weapon in MacFarlane's kitchen in plain view and seized it.  A jury convicted MacFarlane of violating former Penal Code section 12280, subdivision (b),[1] which makes it unlawful to possess an assault weapon.[2]

_____

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

[2] Former section 12280 is part of California's Assault Weapons Control Act (hereafter AWCA), originally enacted in 1989 and codified as chapter 2.3 of title 2 of part 4 of the Penal Code, commencing at former section 12275.  (See Stats. 1989, ch. 19, § 3, p. 67; *In re Jorge M.* (2000) 23 Cal.4th 866, 875 (*Jorge M.*); *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 477.)  The AWCA was repealed in 2010, effective January 1, 2012, and recodified without substantive change in Part 6 of the Penal Code. (Stats. 2010,

It is undisputed the weapon meets the definition of an illegal assault weapon under California law. That definition includes a "semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following: [¶] (A) A pistol grip that protrudes conspicuously beneath the action of the weapon. . . . [¶] (C) A folding or telescoping stock. . . . [¶] . . . [¶] [or] (F) A forward pistol grip." (former Pen. Code, § 12276.1, added by Stats. 1999, ch. 129, § 7, p. 1805, amended by Stats. 2000, ch. 967, § 3, p. 7076; Stats. 2002, ch. 911, § 3, p. 5743, and repealed and recodified by Stats. 2010, ch. 711, §§ 4, 6 at Pen. Code § 30515.) The gun here possessed all of those features. MacFarlane's sole defense was that he didn't know the firearm, as modified, was illegal.

MacFarlane now appeals his conviction on two grounds. He argues the warrantless seizure of his weapon violated the Fourth Amendment because the weapon's illegality was not immediately apparent to the investigating officer when he saw it, and thus the plain view exception to the Fourth Amendment's warrant requirement does not apply. (See *Minnesota v. Dickerson* (1993) 508 U.S. 366, 375.) He also argues the trial court improperly quashed a defense subpoena directed to another deputy sheriff with firearms expertise who examined the rifle back at the sheriff's office and, MacFarlane contends, could not tell whether the rifle was an illegal assault weapon. Since MacFarlane's criminal intent was the sole issue at trial, MacFarlane argues the exclusion of this witness violated his constitutional right to present a defense.

We reject both contentions and affirm his conviction.

## BACKGROUND

On November 17, 2011, Sonoma County Sheriff's Deputy Sean Jones visited defendant's house to investigate a neighbor's complaint that defendant was displaying a defaced Mexican flag that was disturbing neighborhood children. Defendant allowed Jones and another officer inside, after Jones inquired about smelling marijuana and

---

ch. 711, § 4[repeal] § 6 [re-enactment]; Legis. Counsel's Dig., Sen. Bill No. 1080 (2009-2010 Reg. Sess.), Stats. 2010, Summary Dig.; see also Pen. Code, §§ 16000, 30500, 30605.)

defendant told him he smoked it for medical purposes and had his doctor's paperwork inside.

While investigating defendant's marijuana supply, Jones noticed a black rifle sitting in plain view on the kitchen counter. Jones wrote in his police report that "[t]he rifle was a centerfire rifle, had a pistol grip stock, fore end grip, detachable 10 round magazines and a collapsible stock." Defendant told Jones he bought the rifle locally, in California, and that it was legal. Defendant also volunteered that he had modified the rifle, by adding the collapsible stock and fore-end grip. Defendant then showed Jones the original stock and magazine. Jones wrote in his police report that he believed the rifle was an assault weapon but was unsure, so he contacted Deputy Sheriff Erick Gelhaus who was the sheriff department's armorer and firearms instructor. Deputy Gelhaus advised him to seize the rifle so that Deputy Gelhaus could inspect it at the station, and Jones did so.

Thereafter, Deputy Gelhaus requested that the rifle be sent to the Department of Justice in order to determine whether or not it was an assault weapon. A forensic arms expert from the California Department of Justice then examined the rifle and concluded it met the definition of an assault weapon under California law.

Defendant was subsequently charged with one count of felony possession of an assault weapon, under former section 12280(b).[3]

Before trial, defendant moved to suppress evidence of the rifle on the ground that its warrantless seizure violated the Fourth Amendment. The trial court denied his motion, concluding Deputy Jones had probable cause to believe the gun was an illegal assault weapon when he saw it in plain view. We discuss the relevant portions of Deputy Jones' suppression hearing testimony below.

Defendant also subpoenaed Deputy Gelhaus for trial, contending his testimony was relevant to the issue of criminal intent since Gelhaus could not determine whether the

---

[3] He also was charged with a felony count for unlawfully manufacturing an assault weapon, but that charge was later dismissed.

3

rifle was illegal either. Deputy Gelhaus, who by then was on administrative leave, had recently come under criminal investigation, and become the subject of intense media intention, due to a highly publicized incident in which he fatally shot a teenager after mistaking the teenager's pellet gun for an assault weapon.[4] The Sonoma County Sheriff's Office, appearing through Sonoma County Counsel, moved to quash the subpoena and the trial court granted its motion. The court ruled Deputy Gelhaus' testimony was irrelevant and also granted the motion under Evidence Code section 352, concluding that any minimal relevance would be substantially outweighed by a substantial risk of undue consumption of time, confusion of the issues, and misleading the jury.

A two-day trial ensued, at which Deputy Jones, John Yount, the forensic firearms expert from the California Department of Justice, and defendant testified. A jury convicted defendant as charged. Defendant then timely appealed.

## DISCUSSION

### I.

### *The Assault Weapons Control Act*

To put this appeal in context, we begin first with the assault weapons possession statute. For, as noted, defendant's only contention at trial was that he lacked the requisite criminal intent for the charged offense. And all of his appellate arguments rest on his claimed ignorance of the law.

In *Jorge M.*, *supra*, 23 Cal.4th 866, the California Supreme Court rejected an interpretation of the AWCA that would require actual knowledge that a firearm is illegal to possess (*id*. at p. 886), and instead construed former section 12280(b) to require "knowledge of, or negligence in regard to, *the facts* making possession criminal." (*Id*. at

---

[4] Repeated references below to the shooting incident by defense counsel, the court and counsel for Deputy Gelhaus demonstrate that all concerned were aware of the incident, and the publicity it generated. We therefore grant defendant's unopposed request to take judicial notice of the October 22, 2013 shooting incident, as well as the fact that no charges were filed against Deputy Gelhaus who returned to full duty. (See Evid. Code, §§ 459, 452 subds. (g), (h).)

p. 887, italics added.)  That is to say, the prosecution must prove only that "the defendant knew or reasonably should have known the firearm *possessed the characteristics*" bringing it within a type of firearm prohibited by the AWCA.  (*Ibid.*, italics added, original italics omitted.)

The court explained that this standard left room on the margins for cases of innocent possession, "where the information reasonably available to a gun possessor is too scant to prove he or she should have known the firearm had the characteristics making it a defined assault weapon."  (*Jorge M.*, *supra*, 23 Cal.4th at p. 886.)  Yet requiring proof that a defendant actually knew the law would set too strict a standard and impede effective enforcement, as "[n]othing in the language . . . of the AWCA  suggests the Legislature intended to create, in section 12280, an exception to the fundamental principle that all persons are obligated to learn of and comply with applicable laws."  (*Jorge M.*, at p. 886.)  Thus, as construed by the court, the scienter element of former section 12280(b) relates solely to a firearm's characteristics, not its illegality.  (See *Jorge M.*, at pp. 885–886.)

The court touched upon the kind of evidence that would suffice.  With respect to proving *actual* knowledge of a firearms' characteristics, it explained that "knowledge may be proven circumstantially," and that while "in many instances a defendant's direct testimony or prior statement that he or she was actually ignorant of the weapon's salient characteristics will be sufficient to create reasonable doubt," the prosecution "could rebut a claim of actual ignorance by evidence of the defendant's long and close acquaintance with the particular weapon or familiarity with firearms in general . . . ."  (*Jorge M.*, *supra*, 23 Cal.4th at pp. 884–885.)  With regard to proving the defendant *should* have known a firearm's characteristics, the court noted that in most instances the fact that a firearm is of a make and model defined by statute as a prohibited weapon "can be expected to be sufficiently plain on examination of the weapon so that evidence of the markings, together with evidence the accused possessor had sufficient opportunity to examine the firearm, will satisfy a knew-or-should-have-known requirement."  (*Id.* at p. 885.)  And, most notable for purposes here, it observed that this conclusion "would not be altered by

5

consideration of the generic definition of 'assault weapon' " at issue in this case, because "[t]hat section defines the class of restricted weapons by their possession of specified *and readily discernible* physical characteristics."[5] (*Id*. at p. 885, fn. 9, italics added.)

The court went on to explain that, "because of the general principle that all persons are obligated to learn of and comply with the law, in many circumstances a trier of fact properly could find that a person who knowingly possesses a semiautomatic firearm reasonably should have investigated and determined the gun's characteristics." (*Jorge M.*, *supra*, 23 Cal.4th at p. 885.) Only "exceptional cases" would involve instances of "largely innocent possession" not punishable as a felony offense, such as where "the salient characteristics of the firearm are extraordinarily obscure, or the defendant's possession of the gun was so fleeting or attenuated as not to afford an opportunity for examination."[6] (*Ibid*.)

The court concluded: "The question of the defendant's knowledge or negligence is, of course, for the trier of fact to determine, and depends heavily on the individual facts establishing possession in each case. Nevertheless, we may say that in this context the Legislature presumably did not intend the possessor of an assault weapon to be exempt from the AWCA's strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics. Generally speaking, a person who has had substantial and unhindered possession of a semiautomatic firearm reasonably would be expected to know whether or not it is of a make or model listed in section 12276 or has the clearly discernable features described in section 12276.1. At the

---

[5] At the time of the charged offense at issue in *Jorge M.*, that generic definition, now codified at section 30515, had not yet taken effect. (See *Jorge M.*, *supra*, 23 Cal.4th at p. 872 & fn. 2; Stats. 1999, ch. 129, § 7, p. 1805; former § 12276.1.) As originally enacted in 1989, the AWCA designated as "assault weapons" only certain specified types, series and models of firearms (listed in former section 12276) and firearms declared to be an "assault weapon" by means of a judicially administered add-on procedure made available to the Attorney General under former section 12276.5. (See *Kasler v. Lockyer*, *supra*, 23 Cal.4th at pp. 477–478, 492.)

[6] Defendant does not argue on appeal that he falls within either of these "exceptional" situations, nor does he appear to have made any such argument below.

6

same time, any duty of reasonable inquiry must be measured by the circumstances of possession; one who was in possession for only a short time, or whose possession was merely constructive, and only secondary to that of other joint possessors, may have a viable argument for reasonable doubt as to whether he or she either knew or reasonably should have known the firearm's characteristics." (*Jorge M.*, *supra*, 23 Cal.4th at pp. 887–888.)

In short, *Jorge M.* makes clear that ignorance of the law is no defense to a charge of felony assault weapon possession. Only ignorance of a weapon's actual characteristics is exonerating, under circumstances in which the defendant could not reasonably be expected to have known of those characteristics. (See *Jorge M.*, *supra*, 23 Cal.4th at p. 888 [evidence of defendant's knowledge or constructive knowledge of assault weapon's salient characteristics held sufficient]; *People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1323–1325 [same]; *In re Daniel G.* (2004) 120 Cal.App.4th 824, 831–832 [same].)

The trial court in this case instructed the jury in accordance with *Jorge M.*, and defendant does not challenge the instruction.

Against this background, we turn to defendant's contentions on appeal.

## II.

### *Deputy Jones' Warrantless Seizure of Defendant's Firearm Did Not Violate the Fourth Amendment.*

#### A. Standard of Review

In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to all factual findings, whether express or implied, that are supported by substantial evidence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 969 (*Jenkins*).) Any conflicts in the evidence are resolved in favor of the suppression ruling, and we must accept the trial court's resolution of disputed facts and its assessment of credibility. (*People v. Tully* (2012) 54 Cal.4th 952, 979.) We must not reweigh the evidence, and can reject evidence accepted by the trier of fact only if it is inherently improbable and impossible of belief. (*People v. Xiong* (2013)

215 Cal.App.4th 1259, 1268.)  Furthermore, when more than one inference can reasonably be drawn from the facts as found, we cannot substitute our deductions for those of the trial court.  (*People v. Ingram* (1993) 16 Cal.App.4th 1745, 1751.)

We do not defer to the trial court's assessment of the legality of the search under the Fourth Amendment, however, which is an issue we independently determine as a question of law.  (*People v. Eubanks* (2011) 53 Cal.4th 110, 133; *Jenkins*, *supra*, 22 Cal.4th at p. 969.)  " ' "It is the 'ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' " ' "  (*People v. Michael E.* (2014) 230 Cal.App.4th 261, 267.)

### B.      Facts Adduced at the Suppression Hearing[7]

Deputy Jones testified he has more than nine years of experience in law enforcement, including six years as a member of the sheriff department's SWAT team.  As part of his official duties, he carries a department-issued assault rifle on a daily basis.

Jones testified that when he saw the rifle it was lying on one side on the kitchen counter, with only one side visible (he couldn't recall which), and he approached more closely to look at it.  When he did so, he observed that it was a Kel-Tec model, capable of firing 5.56 bullets, with a collapsible stock, a pistol grip and a forearm grip.  No magazine was attached.  Jones immediately thought the weapon was illegal because it resembled his own assault rifle.  He testified it had "very similar" characteristics, other than the brand and some different features.

So, Jones asked the defendant about the rifle and they discussed it for about five minutes.  After confirming the rifle belonged to defendant, the first thing Jones told him was, " 'I'm pretty sure that's an assault rifle, and you can't have that.' "  Defendant responded that he had bought the rifle locally and insisted it was legal in California.  Asked whether defendant's response caused him any doubt, Jones testified:  "Well, you know, often times we get people telling us what we find on them is not illegal but it is.  I

---

**7** Consistent with the deferential standard of review, we state the facts in the light most favorable to the trial court's ruling, drawing all reasonable inferences and indulging all legitimate presumptions from Deputy Jones' testimony.

8

was still confident that it was illegal, but he was a very intelligent guy and he continued to tell me that, no, he bought it, although he said he made modifications to it.  And so he said it was legal because he bought it here in California, but, however, he made modifications to it."  During their conversation, defendant volunteered that he had put the collapsible stock and forehand grip on the weapon, told Jones he still had the original parts, and led Jones to a bedroom where he retrieved the original stock and a 10-round magazine and handed them over to Jones.

Jones testified he believed it was an assault weapon, "[b]ecause it looked like an assault weapon.  It was chambered the same as my assault weapon, and it had the characteristics of an assault weapon."

Asked about the statement in his police report that he was "unsure" it was an assault weapon, Jones explained, "I believed it was an assault weapon but [defendant] kept telling me it was a California legal rifle."  So, he testified, "I figured I would afford him the respect of calling an expert."  Anticipating he would arrest defendant, Jones placed defendant in handcuffs for safety[8] and then called Deputy Gelhaus, who was the department armorer and firearms instructor, to "make sure."

Jones discussed the rifle's characteristics with Gelhaus, who told him to seize the rifle so Gelhaus could inspect it at the station.  Jones did so, unhandcuffed defendant, and left with the gun.  After he left, defendant called him and warned him not to fire the rifle, because " 'it might blow up in your hands. It's unsafe.' "

Jones did not leave the rifle entirely undisturbed before seizing it.  On cross-examination, he testified it was "possible" he touched the rifle at some point while speaking with defendant.  He also acknowledged on cross-examination that he picked the rifle up.  We quote that colloquy in full:

"Q  Well, did you do some inspecting while you were out there?  Did you actually pick up the rifle?

---

[8] Jones observed a shotgun on the wall and suspected there were other guns in the house too because it was filled with military and survival gear, and he didn't want his partner to be left alone with defendant "with a bunch of weapons around."

"A Yes.

"Q And did you do anything with the rifle when you picked it up?

"A I couldn't fire it in the house if that's what you mean.

"Q But did you do anything with it when you picked it up? Did you look at it any closer? Did you check to see if it was registered? Did you do any of those kinds of things?

"A Yeah. *I opened the bolt, shut the bolt, made sure it looks like it would fire a weapon, made sure it was a real weapon.*

"Q So you did some inspecting of the gun out there?

"A Yes.

"Q Okay. And you did move it around and look at it and try to determine—make determinations?

"A I testified to that." (Italics added.)

Jones also explained the statement in his police report that the rifle had "detachable ten-round magazines." This meant the magazine could be removed from the rifle at the press of a button rather than with a tool. He testified that he saw this feature on the rifle too, explaining that it had "the same detach button that my rifle has." He noticed the button located on the rifle's right side, although he could not recall whether that side had been facing him while the rifle was lying on the counter.

### C. Analysis

The Fourth Amendment proscribes searches and seizures conducted without a warrant, and deems them *per se* unreasonable, " 'subject only to a few specifically established and well delineated exceptions.' " (*Minnesota v. Dickerson*, *supra*, 508 U.S. 366, 372 (*Dickerson*).) One is the plain view doctrine, which sanctions police in seizing an item without a warrant if police are lawfully in a position from which they view the object and have a lawful right of access to it, and the incriminating nature of the object is "immediately apparent." (*Dickerson*, at p. 375; *Horton v. California* (1990) 496 U.S. 128, 134–136.) Probable cause is required, not merely reasonable suspicion.

(*Arizona v. Hicks* (1987) 480 U.S. 321, 326–328 (*Hicks*).)  That is to say, police must have probable cause to believe the item is evidence of a crime or contraband.  (*Texas v. Brown* (1983) 460 U.S. 730, 742 (plur. opn. of Rehnquist, J.).)  If "police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," such as by feeling it or moving it even a few inches, the plain view doctrine does not authorize its warrantless seizure.  (*Dickerson*, 508 U.S. at pp. 375–376; *Hicks*, 480 U.S. at pp. 323–329.)

" 'The test for probable cause is not reducible to 'precise definition or quantification' " (*Florida v. Harris* (2013) __U.S. __, __ [133 S.Ct. 1050, 1055]), yet probable cause is not synonymous with certainty.  (See *Texas v. Brown*, *supra*, 460 U.S. at pp. 741–742.)  It "is a flexible, common-sense standard" (*id*. at p. 742), that merely requires "the kind of 'fair probability' on which 'reasonable and prudent [people], not legal technicians, act.' " (*Florida v. Harris*, 133 S.Ct. at p. 1055; accord, *Illinois v. Gates* (1983) 462 U.S. 213, 243, fn. 13 (*Gates*) [requiring "only a probability or substantial chance of criminal activity, not an actual showing of such activity" ].)  In the context of the plain view doctrine, probable cause exists as long as "the facts available to the officer would warrant a person of reasonable caution in believing that the item may be contraband or stolen property or evidence of a crime.  No showing is required that such a belief is correct or more likely true than false.  "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required.  [Citation.]" (*People v. Stokes* (1990) 224 Cal.App.3d 715, 719, citing *Texas v. Brown*, *supra*, 460 U.S. at p. 742.)  That question, moreover, must be judged " 'not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " (*Texas v. Brown*, at p. 742.)  What matters are the facts as observed and understood by the trained eye of a police officer.  (See *id*. at pp. 742–743.)

Judged by this standard, Deputy Jones had probable cause to believe the firearm was an assault weapon when he saw it in plain view.  Although it isn't clear from the record whether he observed all of the features that rendered it illegal before picking it up and handling it, substantial evidence supports an implied finding he saw most of them.

11

Jones was an experienced law enforcement officer, who carried an assault weapon too. The reasonable inference from his testimony is that he could see that it had a collapsible stock, a pistol grip and a forearm grip while the gun was still sitting on the counter.[9] And although he did not testify how or when he concluded that it was a semiautomatic, centerfire rifle, he testified that when he saw the rifle sitting on the counter, "I thought it looked similar to the rifle I carry on patrol. The first thing that came to mind is that it was illegal and he shouldn't have it," because "it looked like an assault weapon to me, and I know I can carry a[n] assault weapon because I'm a . . . peace officer assigned to the SWAT team, but a normal citizen can't carry it." So we cannot second-guess the trial court's implied findings of historical fact, and must indulge the reasonable inference that it also was immediately apparent to Jones, before picking the rifle up, that it was a semiautomatic, centerfire weapon.

The weapon's only proscribed feature the record does not show Jones saw immediately, in plain view, is its detachable magazine. Jones could not recall which side of the rifle he could see while it was lying on the counter, and so there is no substantial evidence the rifle's "detach button," located on the rifle's right side, was visible in plain view—and hence, that the firearm had the capacity to accept a detachable magazine.

That ambiguity in the record is not of constitutional magnitude. Jones could see enough features of this firearm to conclude there was a "substantial chance" it was an assault weapon (*Gates*, *supra*, 462 U.S. at pp. 243–244, fn. 13); he observed it had three out of four characteristics necessary to bring it within the proscribed definition. Furthermore, police officers may rely on an individual's voluntary disclosures to establish probable cause to seize firearms in plain view (see *People v. Gallegos* (2002) 96 Cal.App.4th 612, 629 (*Gallegos*)), and here, defendant told Jones he had modified the rifle from its original configuration which increased the probability that the weapon, as configured, possessed characteristics that in combination were prohibited. These were not

_____

[9] Asked on direct examination to "describe the rifle that you saw sitting on the counter," Jones testified: "It was a black Kel-Tec 5.56—chambered for 5.56 rounds. It had a collapsible stock, pistol grip, and a forearm grip."

12

inherently innocent circumstances.  As has been recognized by federal courts in the context of other dangerous weapons, a police officer's observation of a weapon's "intrinsically incriminating" characteristics may constitute probable cause sufficient to justify its seizure, even if every fact rendering its possession illegal is not yet known. (See, e.g., *United States v. Wade* (6th Cir. Feb. 7, 2002, No. 00-6210) 2002 WL 203211, at p. *3 [upholding warrantless seizure of sawed-off shotgun despite police officer's lack of knowledge it was unregistered in violation of federal law; "because there are so few legitimate uses for a sawed-off shotgun, there is very little probability that the possessor of such a weapon will have registered it"]; accord, *United States v. Carmack* (6th Cir. June 7, 2011, No. 09-5819) 2011 WL 2192633, at p. *5 [unregistered sawed-off shotgun]; see also *United States v. Melvin* (1st Cir. 1979) 596 F.2d 492, 500 [unregistered sawed-off shotgun and automatic weapon]; *United States v. Bills* (5th Cir. 1977) 555 F.2d 1250, 1251 [unregistered sawed-off shotgun and survival rifle]; *United States v. Story* (8th Cir. 1972) 463 F.2d 326, 328 [unregistered sawed-off shotgun]; *Porter v. United States* (9th Cir. 1964) 335 F.2d 602, 607 [same].)

Defendant nonetheless maintains the trial court "ignored" evidence Deputy Jones was not certain the rifle was an assault weapon.  Specifically, he points to the statement in Jones' police report that Jones was "unsure" about this  as well as the fact that Jones called Deputy Gelhaus before seizing the rifle.  This misconstrues the trial court's ruling. The trial court specifically mentioned Jones' uncertainty, but found as a factual matter that Jones believed it was an assault weapon and ruled Jones' lack of certainty was legally irrelevant.[10]

---

[10]  Citing *Texas v. Brown*, *supra*, 460 U.S. 730, the trial court observed, "The issue is probable cause."  It then ruled:  "Initially I think a lot of the language was that the deputy was unsure.  The testimony that I heard today is that the deputy believed it was an assault rifle, that he had a conversation with [defendant] who was extremely cooperative at the time, and based on that conversation with [defendant], the deputy released [defendant] and took the rifle in order to have it sent to, most likely,  . . . the Department of Justice.  [¶] *So the fact that the deputy wanted to confirm this was an assault rifle did not mean there was not probable cause*.  [¶]  So I do believe there was probable cause

13

The trial court was correct on both counts. Asked on cross-examination about his statement in the police report that he was unsure it was an assault weapon, Jones explained, "I believed it was an assault weapon, but [defendant] kept telling me it was a California legal rifle." At bottom, defendant is asking us to re-weigh Jones' credibility at the suppression hearing which we may not do.

Legally, moreover, Jones' lack of certainty is irrelevant and the fact he sought to confirm that this was an assault rifle does not render its seizure unconstitutional. "[T]he determination of whether a Fourth Amendment violation has occurred hinges upon an objective assessment of the officer's actions in light of the circumstances at the time of the search, not upon an assessment of the officer's actual state of mind." (*Gallegos*, *supra*, 96 Cal.App.4th at p. 627.) Jones testified repeatedly he thought this was an assault weapon because it resembled his own, and as we have explained, the immediately observable features and circumstances gave him probable cause to believe that. That Jones did more than was required of him—by eliciting a second opinion out of "respect" for an individual who vigorously denied wrongdoing—in no way undermines the objective, reasonable grounds Jones had for thinking this was probably a prohibited firearm. (See *Texas v. Brown*, *supra*, 460 U.S. at p. 741.) Probable cause " 'does not deal with hard certainties, but with probabilities.' " (*Id*. at p. 742.) It therefore is irrelevant that only later was the gun definitively determined to be illegal. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1044; *Gallegos*, at p. 627 ["While the officer here testified both that he had concluded the tank was probably stolen, and that he 'suspected it might have been' stolen, but did not 'form a complete opinion,' complete certainty that the tank was stolen was not required to allow seizure"].)

Defendant also argues the case is analogous to *Hicks*, *supra*, 480 U.S. 321 and *Dickerson*, *supra*, 508 U.S. 366, in which warrantless seizures were held unlawful under the Fourth Amendment because an item's incriminating nature was not apparent to police

_____

based on the testimony and . . . a consent to enter the home and that the weapon was found in plain view. So the motion is denied." (Italics added.)

14

until they moved the item (*Hicks*, 480 U.S. at pp. 323–329) or felt and manipulated the item (*Dickerson*, 508 U.S. at pp. 374–379) to inspect it. Here, defendant argues Jones inspected the weapon by picking it up and "manipulating" it to "determine its characteristics"—by which defendant presumably means Jones could not tell it resembled his own assault weapon, nor observe the many features we have discussed, without handling the rifle.·

We disagree. This argument rests principally on the colloquy during cross-examination quoted *ante*, in which Jones merely admitted picking the rifle up at some unspecified time, and inspecting it by "open[ing] the bolt, shut[ting] the bolt" to "ma[ke] sure it looks like it would fire a weapon, [make] sure it was a real weapon." While the trial court might reasonably have concluded that Jones discovered *one* of the rifle's proscribed features after picking it up (i.e., its detach button), nothing in that colloquy contradicts Jones' testimony on direct examination that he could tell immediately, on sight, that the weapon looked like an assault weapon and he thought it was one. Likewise, nothing in that colloquy defeats the reasonable inferences we are required to draw that Jones observed the other various features immediately on sight; and that before Jones picked the weapon up, defendant had already volunteered he had modified the gun in various ways. Simply put, defendant's characterization of Jones' testimony on cross-examination ignores the standard of review, improperly drawing inferences adverse to the court's ruling rather than in favor of it. The People argue, and we agree, that we must presume the trial court found Jones picked the weapon up after he already had probable cause to believe it was an assault weapon. (See *Jenkins*, *supra*, 22 Cal.4th at p. 969.)

Defendant also points to Jones' testimony that it was "possible" he touched the weapon while talking with defendant. Here again, however, the fact that Jones could not affirmatively rule out the possibility of touching the weapon at some point is irrelevant, because the substantial evidence of what he saw and thought immediately, on sight, gave him probable cause to believe the firearm was an assault weapon. Furthermore, the trial court reasonably could find, and presumably did, that even if Jones did "touch" the weapon at some point while talking with defendant, Jones learned nothing of substance

15

about the rifle's illegal characteristics in doing so. Deputy Jones testified it "looked" like an assault weapon; not that it "felt" like one. Nothing in this record suggests an assault weapon in plain view is like a lump of drugs concealed in a pocket, whose contraband nature could be discovered through mere sense of touch. (Cf. *Dickerson*, *supra*, 508 U.S. at pp. 369, 375–379.)

In short, this record shows at most Jones picked the weapon up to open and close the bolt to determine if it was a real weapon, *after* already having probable cause to believe it was an illegal assault weapon and thus to seize it. Therefore, Jones' movement of the firearm was not precluded by *Hicks* or *Dickerson*, and the trial court did not err in denying defendant's motion to suppress it.

## II.

### *The Order Quashing Defendants' Subpoena to Deputy Gelhaus Must Be Affirmed.*

Next, Defendant now argues his conviction must be reversed because the trial court improperly granted the motion to quash his subpoena to Deputy Gelhaus. He challenges this ruling on two grounds: (1) the court "lack[ed] jurisdiction" to quash the subpoena at the request of the Sonoma County Sheriff's Department, because the Sheriff's Department and its county counsel lacked standing to "intervene" and appear in the proceeding, which defendant maintains usurped prosecutorial discretion; and (2) the ruling violated his constitutional right under the Sixth Amendment and the due process clause of the Fourteenth Amendment to compel witnesses in his defense, resulting in the denial of a fair trial. We also reject these contentions.

### A. Procedural Background

Sonoma County counsel first appeared on December 9, 2013, the day before Deputy Gelhaus was scheduled to return from administrative leave and become available to accept service of the defense subpoena. At that point, county counsel questioned his relevance as a potential defense witness, and indicated she might file a motion to quash the subpoena. The trial court told county counsel, "however you wish to proceed as far as representing the sheriff's department or deputy based on the service of that subpoena,

16

on testifying based on the subpoena being served on him, I'll leave that up to you in whatever you wish to do." Defendant raised no objection.

A week later, the Sheriff's Department, represented by county counsel, filed its motion to quash the subpoena. No motion to strike the pleading was filed, nor any written objection.

At the next court appearance, January 2, 2014, the day the motion was noticed for hearing, county counsel again appeared with no objection by the defense, there was further colloquy about defense efforts to interview and subpoena Deputy Gelhaus, and the trial court continued the matter.

At the hearing the following day, the trial court directed the defense to file a written response to the motion, noting concerns about defendant's eleventh-hour efforts to call Deputy Gelhaus as a witness. It was only at that point defense counsel raised an issue about county counsel's participation, questioning county counsel's standing to object to the subpoena on relevance grounds. The trial court then asked if defense counsel was refusing to respond in writing to the motion, and asked, "Do you have any legal authority stating that county counsel cannot file this motion?" Defense counsel responded, "I think county counsel can file anything that they want, but what is their standing to come in here and argue relevance of my witness?" After further discussion, the trial court again ordered defense counsel to respond to the motion "so I know what your position is." And it specifically told defense counsel, "If you believe this is an inappropriate motion filed by county counsel, you can put that in writing too and give me legal authority why you believe it's inappropriate to even address this motion."

Thereafter, defendant filed a written opposition arguing only that Deputy Gelhaus was a relevant and material witness. The trial court subsequently issued a four-page written ruling granting the motion, and at the hearing where the ruling was distributed and discussed, defense counsel again interposed no objection to county counsel's involvement.

## B.     Standing and "Intervention" Issues

Most of the challenges defendant now raises on appeal to the order quashing his subpoena are new, and so they are forfeited. " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method . . . ." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590.) " ' "No procedural principle is more familiar . . . than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. " ' " (*Id*. at p. 590.)

The sole issue on appeal that defendant did raise below, albeit fleetingly, is the question of standing, having briefly at one juncture questioned county counsel's standing to contest the subpoena. But after the trial court specifically ordered defendant to address in writing "why you believe it's inappropriate to even address this motion" and to provide legal authority, defendant didn't do so, and never re-raised the standing issue. In these circumstances, defendant abandoned its standing objection. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 521, fn. 3 ["Waiver is the ' " 'intentional relinquishment or abandonment of a known right,' " ' whereas forfeiture is the ' "failure to make the timely assertion of a right" ' "]; *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 544–545 [issue that trial court deferred but was not discussed again held abandoned].)

Defendant maintains the standing issue was preserved because his comments sufficiently informed the court he believed the county counsel lacked standing. But the problem is not that no objection was made. It's that defendant, after adverting orally to a possible standing problem, just let the matter drop. "[I]ssues raised *and then abandoned* in the trial court . . . cannot be considered on appeal." (*Johanson Transportation Service v. Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583, 588, italics added.) Defendant provided no argument or analysis for the court despite being ordered to do so, nor did he ask for a ruling on the standing issue—even after the court rendered its written decision on the motion's merits. Whether we call that forfeiture (cf. *Araiza v. Younkin* (2010)

18

188 Cal.App.4th 1120, 1126–1127) or abandonment (see *City of San Jose v. Garbett*, *supra*, 190 Cal.App.4th at pp. 544–545), the result is the same: defendant did not preserve the standing question for appeal.

Defendant nonetheless argues "[c]ounsel could not have provided authority as to county's intervention . . . because no such authority actually existed" and "[t]he defense was caught off-guard." We are puzzled by that argument, insofar as defendant has provided three-and-a-half pages of legal analysis on appeal addressing what it calls an issue of first impression. More to the point, the absence of directly controlling authority does not relieve a party of the obligation to preserve an issue for appeal rather than simply let it go. Whether there is a case "on point," a party must argue and analyze an issue with sufficient specificity and in sufficient depth to enable a trial court meaningfully to rule, *and* must request a ruling. Defendant did neither.

Citing *People v. Marshall* (1996) 13 Cal.4th 799, 825, defendant also argues " '[a] criminal defendant cannot have forfeited or waived a legal argument that was not recognized at the time of his trial.' " *Marshall* does not address that point, and appears to be mis-cited. The proposition is articulated in published authority (see *People v. Esquibel* (2008) 166 Cal.App.4th 539, 556), but the case deals with the idiosyncratic, shifting legal landscape of sentencing error under *Blakely v. Washington* (2004) 542 U.S. 296. In practical effect, it reflects only that "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile *or wholly unsupported by substantive law then in existence*" (*People v. Welch* (1993) 5 Cal.4th 228, 237, italics added), such as "when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change."[11] (*People v. Turner* (1990) 50 Cal.3d 668, 703.) Reviewing

_____

[11] *Blakely* represented such a " 'sea change' " in Sixth Amendment law that competent and knowledgeable attorneys could not reasonably have been expected to have anticipated the decision, and therefore could not forfeit error by failing to object on the basis of the principles it announced. (See *People v. Black* (2007) 41 Cal.4th 799, 812, rejected on other grounds, *Cunningham v. California* (2007) 549 U.S 270, 293.)

19

courts "cannot expect an attorney to anticipate that an appellate court will later interpret the [law] in a manner contrary to the apparently prevalent contemporaneous interpretation." (*In re Gladys R.* (1970) 1 Cal.3d 855, 861.) But that is far different than relieving a criminal defendant who does recognize and raise a potential legal issue from pressing the issue to conclusion in order to preserve it, by arguing the point, supplying legal authority when directed to do so and requesting a ruling.

Defendant also argues it would have been futile to try to do more. "The fact that the court requested defense counsel to commit his objection to writing would clearly not have moved the court," he contends, because "[t]he court's demeanor and statements show its determination to side with the county regarding Deputy Gelhaus." We disagree. The court twice asked defense counsel to provide legal authority suggesting the motion was improper. Far from suggesting the trial court had prejudged the standing issue, the court's comments reflect the court would have considered it. It was defense counsel, not the court, who closed the door on this issue by cutting off the conversation before it had even yet begun.

Finally, defendant argues the alleged error in county counsel's involvement was a "jurisdictional" error that can be raised at any time. That, too, is unavailing. Issues relating to the court's "jurisdiction" in the fundamental sense—that is, the court's "power over persons and subject matter"—can be raised at any time. (*People v. Mower* (2002) 28 Cal.4th 457, 474, fn. 6.) But issues pertaining to a court's "jurisdiction" in the non-fundamental sense, meaning "a court's authority to act with respect to persons and subject matter within its power," may be waived or forfeited. (*Ibid.*) Defendant's argument here is that the trial court lacked jurisdiction in the non-fundamental sense, and "abus[ed]" its power by permitting county counsel to participate in the case. That contention does not affect the trial court's personal jurisdiction over defendant nor its subject matter jurisdiction over this criminal prosecution, and hence it is subject to bars including waiver and forfeiture. (See *ibid.*)

In all events, had the standing/intervention issue been preserved, we would reject defendant's argument. All that occurred is that a third-party witness (Deputy Gelhaus)

20

made an appearance through counsel (i.e., county counsel) to move to quash a subpoena directed to him in a criminal prosecution. That is unremarkable. (See, e.g., *In re Finn* (1960) 54 Cal.2d 807, 809–810, 813 [affirming order granting motion filed by city attorney to quash criminal defense subpoena directed to police chief and police commissioners, because defendant "failed to show that the persons he subpoenaed could offer relevant testimony in his behalf"].)

Contrary to defendant's argument, moreover, this did not usurp prosecutorial discretion under *Dix v. Superior Court of Humboldt County* (1991) 53 Cal.3d 442. Deputy Gelhaus was a witness the defense wished to call, not the prosecution. Below, the prosecution was at best indifferent to the motion to quash and voiced no objection to it. And the People now tell us in their appellate brief that "had the trial court precluded county counsel from bring [*sic*] the motion to quash on Deputy Gelhaus' behalf, the prosecution would have filed an identical motion." *Dix* holds only that crime victims lack standing to intervene into ongoing criminal prosecutions (there, in an effort to litigate a sentencing determination). (See *id*. at pp. 450–452.) It has never been construed to bar a third-party witness' motion to quash a defense subpoena. Furthermore, nothing about the motion filed in this case impaired the prosecution's authority to decide "whom to charge, what charges to file and pursue, and what punishment to seek" or how to conduct its case. (See *id.* at pp. 451–452.) Nor did county counsel try to intervene into the criminal prosecution and exercise any prerogatives of a party, such as exercising a peremptory challenge to the judge, as in the only other authority defendant cites. (See *Avelar v. Superior Court* (1992) 7 Cal.App.4th 1270.)

In short, defendant has cited no authority holding that the motion to quash was procedurally improper, and we see nothing inappropriate about it.

### C. Defendant Was Not Deprived of a Fair Trial.

Defendant also did not argue below that quashing the Deputy Gelhaus subpoena would violate his constitutional right to compel the attendance of witnesses. However, "[t]he right of an accused to compel witnesses to come into court and give evidence in the accused's defense is a fundamental one." (*People v. Jacinto* (2010) 49 Cal.4th 263, 268).

21

In addition, defendant's argument at most amounts only to "a new constitutional 'gloss' " on a claim he did preserve below, namely that his subpoena should not be quashed because Deputy Gelhaus was a relevant and material witness.  (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*).)  We therefore proceed to the merits of this issue.

"The Sixth Amendment provides that '[i]n all criminal prosecutions,' the defendant has the right 'to have compulsory process for obtaining witnesses in his favor.' (U.S. Const., 6th Amend.)  This right is applicable to the states under the Fourteenth Amendment's due process clause.  (*Washington v. Texas* (1967) 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019.)  Our state Constitution has a similar provision.  (Cal. Const., art. I, § 15 [a criminal defendant has the right 'to compel attendance of witnesses in the defendant's behalf'].)" (*Bryant*, 60 Cal.4th at 367–368.)  Nevertheless, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense,' " and courts retain " 'a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Jones* (1998) 17 Cal.4th 279, 305.)

Furthermore, "[a]lthough a criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor, this does not mean the court must allow an unlimited inquiry into collateral matters; the proffered evidence must have *more than slight relevancy*." (*People v. Marshall*, *supra*, 13 Cal.4th at p. 836 (italics added); accord, *People v. Babbitt* (1988) 45 Cal.3d 660, 684–685 [" 'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense' "]; see also *People v. Jones*, *supra*, 17 Cal.4th at p. 305 [no violation of defendant's federal constitutional right to present witnesses in his defense by barring witnesses whose testimony would consist of "time-consuming hearsay and character evidence that was not particularly probative"].)  In particular, "[a] defendant claiming a denial of compulsory process must plausibly show that the missing testimony 'would

22

have been both material and favorable to his defense.' " (*Bryant*, *supra*, 60 Cal.4th at 367.) Defendant also must show that the deprivation was "arbitrary or disproportionate to any legitimate purpose." (*Ibid*.) Due process will not be offended, at bottom, unless " ' "the absence of . . . fairness fatally infected the trial" ' " such that defendant necessarily was deprived of a fair trial. (*Id*. at pp. 367–368.) Here, the record does not show Deputy Gelhaus' testimony would be material, nor was the proceeding fundamentally unfair.

Evidence that a third party, including even a firearms expert, had trouble recognizing this firearm as an illegal assault weapon could be potentially relevant only if the prosecution could not prove beyond reasonable doubt defendant *actually knew* his firearm possessed the prohibited attributes. For only if defendant lacked actual knowledge of those attributes would it be necessary for the prosecution to prove he reasonably *should have* known of them. (See *Jorge M*., *supra*, 23 Cal.4th at p. 887.) In opposing the motion to quash the Gelhaus subpoena, though, defendant didn't argue he would claim actual ignorance of the gun's salient attributes such that the critical issue at trial would be the "should have known" standard. Thus, he failed below to demonstrate how Gelhaus' testimony might be relevant. (See *In re Finn*, *supra*, 54 Cal.2d at p. 813.)

The evidence at trial, moreover, revealed that Deputy Gelhaus would not have been a relevant witness, much less a vital one, unlike in *Washington v. Texas* (1967) 388 U.S. 14, the sole authority defendant cites. (See *id*. at p. 16.) There was ample undisputed evidence, both circumstantial and direct, that defendant actually knew his gun possessed the proscribed attributes, and defendant never contended otherwise. (See *Jorge M*., *supra*, 23 Cal.4th at p. 884 ["knowledge may be proven circumstantially"].) He admitted facts demonstrating his "familiarity with firearms in general" (see *id*. at p. 885): he had military firearms training twice a year for four years some 40 years ago while serving in the Air Force, including training with an M-16 rifle, and presently he owned a shotgun. He also admitted facts demonstrating his "long and close acquaintance" with this rifle's physical features (see *ibid.*): he admitted "shopping around" and researching the purchase of this rifle ahead of time, through "[v]arious

stores, gun magazines, catalogs" and online, and he then spent *five hours* disassembling and modifying the weapon. And, *he admitted actual knowledge of the rifle's prohibited features too*: he admitted he bought the pistol grip, telescoping stock and fore-end grip and put them on the gun, he admitted the rifle is semiautomatic and has a detachable magazine, and he also admitted it's a centerfire weapon, testifying "I think so. That's— that took me a while to figure it out, but, yes, it is."

Defendant admitted that he knew the gun had these features, and there was no evidence to the contrary that could have created reasonable doubt. (See *Jorge M.*, *supra*, 23 Cal.4th at pp. 884–885.) *He merely claimed ignorance of the law*. As he now puts it in his appellate brief, his "sole defense would be that he did not know or reasonably could not have known that the rifle he purchased and wanted modified to accommodate his physical disabilities *was illegal*." (Italics added.) Yet this entire theory of defense was legally unsound. For as explained, *ante*, the Assault Weapons Control Act confers no exemption on the owners of firearms from "the fundamental principle that all persons are obligated to learn of and comply with applicable laws." (*Jorge M.*, *supra*, 23 Cal.4th at p. 886; see also *People v. King* (2006) 38 Cal.4th 617, 627 [to prove knowledge of illegal firearm possession, prosecution "need not prove that the defendant knew there was a law against possessing the item, nor that the defendant intended to break or violate the law"].) And, the undisputed evidence at trial that defendant actually *did know* the gun had the attributes of an assault weapon rendered irrelevant the question whether he reasonably *should have discovered* those features.[12] It thus was irrelevant whether anyone else had difficulty discerning them, firearms expert or no.

Finally, we also are satisfied there was nothing fundamentally unfair about this trial. (See *Bryant*, *supra*, 60 Cal.4th at p. 368.) Even if Deputy Gelhaus might have offered relevant testimony on this point, it would not have been vital to the defense.

---

[12] Nor has defendant ever claimed this is an exceptional case, where "the salient characteristics of the firearm are extraordinarily obscure, or the defendant's possession of the gun was so fleeting or attenuated as not to afford an opportunity for examination . . . ." (*Jorge M.*, *supra*, 23 Cal.4th at p. 885.)

(Compare *Washington v. Texas*, *supra*, 388 U.S. at p. 16 with, e.g., *People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on another ground, *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Deputy Jones testified on cross-examination that he consulted Deputy Gelhaus for a second opinion, Gelhaus was a firearms expert, Gelhaus asked to see the rifle, and ultimately Gelhaus sent it to the Department of Justice because "[h]e didn't want to offer an opinion on it.  He said he stopped doing that . . . ."  So the jury already knew that Deputy Gelhaus would not opine definitively if this was an assault weapon. *And defense counsel argued that theory to the jury*.[13]  Putting Deputy Gelhaus on the stand to confirm these events was not essential.  (See *Cornwell*, at p. 82.)  Trial courts do not violate the Constitution by excluding evidence that is repetitive or " ' "only marginally relevant." ' "  (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326.)

## DISPOSITION

The judgment of conviction is affirmed.

---

**13**  In closing argument, defense counsel stressed that Deputy Jones had been unsure if the rifle was an assault weapon and called Gelhaus for a second opinion.  "He's going to call the main guy, the big guy in the sheriff's department because what are we going to do about this?  [¶]  Well, he tries to explain it to him over the telephone, and he doesn't say 'Well, you got—this is definitely an assault weapon, arrest Mr. MacFarlane.' He says, 'Why don't you grab it, bring it to me, and let me inspect it.'  [¶] . . . [¶]  What's the big issue if it's so easy to figure all of this out . . . ?"  "So now he goes . . . to the sheriff's department.  They take a look at it.  'And, well, it still sure looks like an assault weapon, but you know what, I think that we've got to send it to the Department of Justice and have them start doing some tests on here and trying to figure out what this is.'  [¶] And so now we have the armorer, the training person from the sheriff's department.  We have Deputy Jones who is the SWAT man, and still no determination."

25

 

 

 

 

 

 

 

                                _____

                                STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*People v. MacFarlane* (A141326)